Case number 16-1092. Delaware Riverkeeper Network and L Petitioners v. Federal Energy Regulatory Commission. Mr. Stiplewicz for the petitioners, Ms. Kafer for the respondent, Ms. Stovall for the intervener. All right. No sitting down. Aaron Stiplewicz on behalf of the petitioners, Delaware Riverkeeper Network and the Delaware Riverkeeper. This case involves claims under two separate statutes, the Clean Water Act and NEPA. However, the violations alleged of these statutes are necessarily, to a certain extent, interwoven and interconnect with each other. Here we have a situation where the Federal Energy Regulatory Commission authorized a project without knowing the full extent and scope of the necessary information to make a reasonable determination regarding the significance of the harms that will result from the project. You mean conditionally authorized, right? Conditionally authorized, correct. That's the big difference. Yes. I don't know if that necessarily makes a big difference in this case. And the facts here are clear and uncontested. The Federal Energy Regulatory Commission identified only seven of the roughly 50 wetlands as being exceptional value wetlands, meeting the highest and most strict criteria in the state of Pennsylvania for providing enhanced wetland values and functions. And despite the fact that they identified only seven of these wetlands meeting that criteria, we know for a fact that every single wetland in the project actually is exceptional value. And we know that because of the information that came out after FERC issued its certificate. The environmental assessment is also riddled with numerous and what I would classify as egregious errors when it comes to examining the cover type of these wetlands. And for reference, I would refer you to page 21 of our reply brief where we show an image of wetlands, I think it's 002, 007, and you see that wetland is entirely within the tree line. So it's an entirely forested wetland. You go and look at the table for that wetland, and it's classified as an emergent wetland. An emergent wetland, by definition, has no trees. And when you're calculating, and that's important because when you're calculating the mitigation and the way that FERC calculated the mitigation for this project here, is they calculated based on a ratio of change in cover type. So if you don't get the classification right in the first instance, and you misidentify the cover type for a forested wetland, you can't calculate the appropriate mitigation that takes place later to compensate for that deforestation of that wetland. And these problems all could have been partially avoided if not altogether avoided had FERC simply waited for the 401 certificate to be issued prior to it issuing its certificate, authorizing the project. I'm not sure I understand. Waited for the state certificate, you mean? Yes. Correct. Okay. So my understanding is that they did not approve the project going forward. They conditioned it upon obtaining the state certificates. So I'm not sure how your argument works here. Yes. So, I mean, I would say first that this case is different from Gunpowder Riverkeeper for a number of reasons. I don't care whether it's different. I just want to know why it is the case. What in the conditional certificate allowed the pipeline company to go forward with the pipeline before the state certificates came in? FERC authorized pursuant to the certificate tree felling activities. That was in those letters, is that right? The letter orders, correct. And you didn't challenge them. Those are final agency actions, which you didn't challenge in court, right? Correct. So isn't the nature of your objection those letters, which I don't know whether they were bad or good, but they were the things that authorized the tree felling. So why didn't you challenge them? You did challenge them. Actually, you sought stays, but after that failed, you didn't then file a petition for review. Yes. So if we were challenging the ‑‑ if we were bringing a case that the tree felling orders necessarily actually resulted in a discharge pursuant to the Clean Water Act, that's a separate claim. That's a challenge to the court. Well, you could have made a claim that it was arbitrary and capricious to have done those letters until the state had issued their certificate. You didn't do that. Yes, but I don't think we need to. All we need to show is that a discharge may occur and that activities on the ground were taking place on the ground. No, no, no. This may occur from the tree felling, which you didn't contest. Yeah, that's correct. We did not contest that the tree felling ‑‑ So the main discharge issue, there's nothing in the conditional approval. The ultimate power for any ‑‑ for the project applicant to move forward, there's nothing in the conditional order that says, well, for tree felling activities, you need to get our authorization to move forward. There's nothing in the conditional certificate that says that. It says you have to get the necessary environmental conditions. Right. You have to be satisfied. If it turns out that the letters were unlawful, either because they were arbitrary and capricious or because they allowed discharge or because they're inconsistent with the conditional order, then you could have challenged it on any of those grounds. We may have, but I don't even think we need to show that activities took place on the ground that may have resulted in a discharge to be successful on our sequencing claim regarding the timing of the 401 certification. Okay, so why is that? And that's because the clear language of 401 states that no license or permit shall be granted until the certification required by this section has been obtained. It does not say no activities that may result in a discharge shall be granted until the certification required by this section has been obtained. That's a meaningful difference. And I would further submit that ‑‑ I'm sorry, so what does that mean? That means, in your view, that the letters were unlawful. But I don't understand why this is ‑‑ Perhaps they are. But that's not the case that we're bringing. I know. I'm wondering maybe whether you brought the wrong case. That's what I'm wondering about. I am but one man. I love to bring many cases. I know. But this is sort of the path that we chose here. And I think it's also important to understand that if you accept the premise that no activities that may result in a discharge shall be granted until the certification required by this section has been obtained, that reads out the purpose of the next sentence in section 401A1, which states no license or permit shall be granted certification if the certification has been denied by the state. Here, FERC could never have complied with that provision. Why? Because had PA denied the 401 certificate, FERC had already issued its certificate. No, it issued a certificate condition on the grant, on the non‑denial. It clearly would have been stopped. I mean, if the state ‑‑ they couldn't do anything until the state approved. Absolutely. I mean, I respectfully disagree that they couldn't do anything. Well, they could do something, but they would be subject to challenge. If the state said no, and then they went ahead and gave final approval, you have an easy case. Yeah, and I think ‑‑ but there's a second element here also. And this is really what I would like ‑‑ what I would go back to, is that the data in the section 401 water quality certificate materially conflicted with the information that was relied on to provide the certificate in the first place. We know that when the 401 came out and that there was a proper evaluation of the wetlands and the impacts and the quality of the wetlands, we know that was materially different than what FERC relied on to make a determination regarding the significance of the impact. And that's especially important here. When the wetlands at issue, there is no ‑‑ That's your strong argument. What happens if we agree with you on that argument? What happens? That sort of goes to what remedy is available. And I think the remedy is that we remand back to FERC to examine all the information it should have examined in the first place. So you remand back to FERC so that they can provide answers to your points about the wetlands, right? Yes, that's correct, and determine whether or not ‑‑ That the state properly considered. That the state did ‑‑ that the state considered. But we have to understand that there's a difference in the purpose and objectives between the Clean Water Act and NEPA. And what NEPA is really interested in is, in the context of this case, you have an environmental assessment. Further environmental review is necessary under two circumstances. The first circumstance is whether, if the agency determines that there's a significant impact, then you go to an environmental impact statement. Or if the agency determines that we're not sure, we're actually not sure if there's a significant impact, then, again, it goes on to further review. And so I would submit to you here that there is value added in going and remanding this back to FERC so that they can make a determination whether or not the quality of the wetlands impacted and whether their failure to take into account that is NEPA. Is the state approval worth nothing? That doesn't affect anything? When the state gives its approval, does that have some impact? Perhaps it does, but in the context of NEPA, we're talking about a cumulative review of a lot of different elements. So we don't know if this case was right on the edge of being significant or not significant. Kelso, maybe I misunderstood your argument. I thought it was a far more modest one. I thought you were saying there are a couple of elements of the wetlands determination in particular that FERC just hasn't answered. And so wouldn't the answer to that, if we agreed with you, have FERC answer it? They may have perfectly fine answers, but we don't know what they are. Exactly. That's exactly right. We just don't know, and I can't speculate as to what their biologists are going to determine or whoever they have looking at this application. See, the thing I don't understand with that argument is, as I read it, as best I could figure out, you can tell me if I'm wrong, the mitigation considerations seem to be exactly the same. You did quibble over, well, the acreage was a little different here and there. But as I read it overall, anyone who looks at this NEPA statement, and that's all you're doing is giving guidance. It's just did you take account of everything? I mean, you took account of all classifications. The acreage may have been slightly off here or there, but so what was my question? Because the mitigation considerations that someone is looking for are all obvious. Yeah, well, I would say that mitigation is an important part of finding there's no significant impact, and when you have a mitigation plan like here, where the mitigation plan is expressly and specifically focused on replacing cover type on a three-to-one ratio. So in other words, if you mess up on one acre of forest type, that's magnified by three in the mitigation plan. But I don't see where the adverse effect comes in. NEPA doesn't command any particular action. But it does? And you went from whatever FERC said in the EA to what the state did, and you agree the state got it completely right. So there was no confusion in how to think about what we're working with here. And it seems to cut right against your argument that someone might be confused with FERC's EA, and I'm not sure why they would be confused, because I think all the mitigation considerations are quite obvious. The state certainly got what they were supposed to get, and anyone else looking at it would understand. So part of the reason why FERC found that there was no significant impact was specifically premised on there being an adequate mitigation plan. And unless you get that information right in the first instance to provide a correct baseline from which to develop your mitigation plan, you may actually have significant impacts. We just don't know because the analysis wasn't done based on the correct information. What do you think was the worst failing in the mitigation plan? Well, I think the most obvious one was the one we provided in our brief on page 21 where we showed that a wetland was a completely forested wetland. You don't need to be a wetland specialist to look at that wetland. Page 21 of your reply brief. Yes, page 21 of the reply. You don't need to be an expert to see that that wetland is clearly forested. And there are numerous other examples where the majority of the wetlands are forested. And those forested wetlands were completely unaccounted for in the mitigation plan. And what makes this worse is that each one of these wetlands are— The state didn't miss anything, right? I don't know. I don't know. But you said that what they did was fine. So what happened with the— When the 401 water quality certificate was issued, there was no—at that time, there was no examination as to whether or not the certificate actually— there was no examination of whether the product complied with water quality standards. I know that may sound crazy, and that was what we were arguing in that case is that it's crazy. But you lost that case. We did lose that case because—and the reason why we lost that case is it actually supports our argument here. And there the court said, you petitioners were not harmed because the 401 water quality certificate did not authorize construction activity. And then I believe the court directly states that the Natural Gas Act grants for the exclusive authority to authorize construction by issuing a certificate of public convenience and necessity. So the power is derived directly from that certificate. And that's directly from that brief. And I believe that supports our position here, that construction activity— that the power to move forward with construction activity— and I would submit that tree felling is construction activity—is derived from the certificate. Is there something that came out in the state certificates that wasn't known before? Was there—could you rephrase that? Is there information about wetlands that came out as a consequence of the state certificates that wasn't known before they were issued? That wasn't known before FERC issued their certificate? No, no. I'm sorry. Before the state issued their certifications, was there some— did the states come up with some information that wasn't previously known? They were responding in large part to comments and expert reports that we submitted to them saying that state—you've got to look at all these wetlands as being exceptional value because they're providing high functions of value. And you made the same argument to FERC. And we made the same argument to FERC. So I'm still stuck on this question of—okay, maybe it's a mootness question. The state has now—state certificates have now issued. Why isn't the claim of the conditional certification conditioned on state certifications moot? And I want you to leave out the foresting part because I'm going to assume for the purpose of this argument— the felling part because I'm going to assume for the purpose of the argument the only way you could challenge that was through challenging the letters. I think in two ways it's not moot. One, by issuing the certificate later and that information that FERC did not consider, that happened after the certificate— What's that information? What information? The quality of the wetlands being impacted. I thought you said you put that in as part of your comments on their EA. We did. We submitted that roughly 16 wetlands were EV. So it's not that they didn't do it. They did it. They had the information. They just came out differently than you did. So the Federal Energy Regulatory Commission had the information that we submitted regarding 16 wetlands. The project applicant and PADEP later determined that it wasn't just 16 wetlands. We actually underestimated the number and the quality of the wetlands being impacted here by a significant—by a magnitude of 35 wetlands or so because PADEP eventually found that the quality of every single wetland in the project area, not just 7, not just 16— So are you saying that no information came to light after the EA was issued? Is that correct? Yes, correct. That's correct. And I have to say I think I missed that point. Is there sort of an additional claim here that they should have readdressed the EA later? I don't remember reading that. That FERC should have addressed the—we didn't have an opportunity to comment. We couldn't have known and anticipated what PADEP would find. That was in addition to what we found when we were commenting over 8 months prior in the comment period for the EA. Otherwise, we would have. Otherwise, we would have brought that up. But I think it also—it goes to one more issue, is that it robbed the public of their ability to meaningfully participate when they don't know and our members don't know the true scope of the harms here. That's not a problem of a conditional certificate. That may be a problem with the timing of the EA, which I didn't understand you to be making. The timing of the—so, right, because your comment period is limited to 30 days after the EA is issued. Okay. But didn't FERC ultimately require that TRANSCO had to—with respect to their wetland delineations, they had to comply with the Army Corps of Engineers and with the state and with what FERC was saying? I'm still not understanding where is the harm to you on your side of it? Yeah. So I believe that it was the Federal Energy Regulatory's position that they only had to comply with the Army Corps and that they didn't even consider the Pennsylvania State Water Quality Designation methodology. That's my understanding from their briefing, is that it was pretty clear that they took that position when, in fact, the EA is sprinkled all over the EA are references to this Pennsylvania methodology for identifying sensitive water bodies, surface waters, including— No, that's not the way I'm reading it. It said that they had to comply with each of the agencies, what each had to say. Well, say it in your— So from what I understand from the environmental assessment, that that is true, that they do have to comply with all the provisions that the states provide in their state certificates. But to get to the harm here, I think the— Wetlands impacts will be minimized and compensated for by implementing the construction, restoration, and mitigation measures proposed by Transco and as may be required by the Army Corps and by state agencies. So with this, I'm just not understanding where is the harm? What's wrong with the— Well, I think there's— I don't see how you can say there was a final action taken. But in any event, I'm still not sure what harm you're complaining about. This was the ultimate action. So I think the harm, again, is twofold. One is a procedural harm in that the public wasn't able to comment on the full scope of the impacts resulting from the project. But I think the second harm is that FERC was simply unaware at the time it issued its EA and its finding of significant impact, what the quality of the wetlands that were being impacted were. They had no idea. They could have been absent— But they knew that at the time that they issued the final approval. They must have— The final approval came prior to the 401 coming out. That's the conditional order. Yes. Correct. The conditional order had to be made final. It's—I don't know. Also, I would say that the 401 came out after even the order for tree felling and many other orders to proceed with other construction activity. I'm a little bit confused. What's the relationship between the environmental assessment that you're challenging and the final clearance, the final certificate? Are you saying had they known—had the environmental assessment been done properly with FERC giving its full responses that maybe the outcome would have been different in terms of the final clearance? Perhaps the EA would come to a different conclusion. So the EA has to either determine whether, again, like I said earlier, whether they don't know whether there's a significant impact or whether there's a significant impact, or the third, which is what they found, a finding of no significant impact. There's three possible outcomes. And the finding of no significant impact is recommended in the EA and then adopted in the FERC order, the certificate itself. And we're saying— Because that's what you're looking for. You're looking for let's reopen the EA at least in this part to require FERC to respond with your hope that it will change the outcome. Yes. Yes. That's essentially what our case is. So you didn't have an opportunity to challenge the EA and went to rehearing? You can't challenge—you cannot challenge an environmental assessment absent final agency action. And final agency action happens here through, one, the FERC order. Then we have to submit a rehearing request, which we did, which FERC then is required to respond to within 30 days, which they did by issuing a polling order, which then we waited a year and two months to finally have them issue a final order. And then we finally get into court. So that's why this project is in service and all we're left talking about now is going back and looking at the EA and potential mitigation instead of what I would hope a more timely review would be. All right. We'll hear from the government. Thank you. Thank you. I think it would help our consideration if you would focus on the latter half of these arguments. That is, what's the consequence of having a conditional certificate and putting off what happens during the time between that and the time that the state certificates are issued and how this impacts the EA on the arguments that he was just making at the end? Okay. I'd be happy to do so, Your Honor. I think as we've recognized, the conditional certificate does not authorize anything. The pipeline has to come back to FERC in order to get authorization to proceed with any type of construction activities. Did they come back at a later date after the states were done and get something? I can't find them in the record. So they have received. The way that most pipelines are constructed is in pieces, and so some of the references that you've seen in the papers before you would be to, for instance, I think the first authorization was to construct a pipe yard, and then there was an authorization for some tree felling in one area. Then there was an authorization for some tree felling in another area. So it's sort of doled out piecemeal based on the environmental constraints, based on the completion of review and authorizations from all of the other federal and state agencies that are involved. Getting back to, I think, your concern, Judge Garland, about how this affects Riverkeeper's ability to participate in the proceedings and to challenge the EA, there is no question that they had ample opportunity to comment and respond to the EA, which was issued I think a full year or six months maybe before the certificate order in this case. They're able to, on review of the certificate order, which of course adopts the environmental assessment, or it did in this case, they're able to challenge the findings in the EA. They've done that here and now brought those arguments to this court. So there's no procedural issue, at least that I can identify. What is the explanation for the discrepancy between what petitioners and the intervener claimed was the extent of exceptional wetlands coverage? I think both of them said 61% of the wetlands were exceptional. FERC relied on a much different number, 13%. What's the explanation for the discrepancy? Because I don't believe FERC has offered one other than saying we use good methodology. Never really took on an explanation for that specific discrepancy. So the key point is this. The commission did not rely on Pennsylvania's methodology for classifying wetlands, which is the exceptional or other methodology which counsel for Riverkeeper has referenced. The table appendix I in the environmental assessment includes a column that indicates what the ranking was that the commission was presented with from the pipeline company, whether it's exceptional or other. But if you look at the commission staff discussion of wetlands a few pages earlier in table 2.2.4-1 in the environmental assessment, you'll see that the commission used the core methodology, the Army Corps of Engineers methodology for assessing. One methodology ends up with a finding that 13% of the wetlands is exceptional, and another ends up with 61%. That's a big discrepancy. The commission's not actually characterizing anything as exceptional. It's listed as a data point in the environmental assessment, but the commission did not rely on that. What the commission relied on was the finding, and it did, let me be clear, recognize that there would be a change in wetland quality. In particular, going to Riverkeeper's arguments, I think there are eight acres of forested wetlands that would be impacted, and 4.3 of those would be permanently converted to another type of wetland. I should also emphasize, Riverkeeper has not alleged that there's any total wetland loss here at all. If we take a step back for a second, what we're dealing with here under NEPA is an environmental assessment, not an environmental impact statement. An environmental assessment requires a brief discussion of the impacts, and the commission's analysis here of wetlands using the very reasonable Corps of Engineers methodology surely satisfied that. Perhaps we should talk a little bit about what happened after, I think, going back to your initial question. I think I heard you. I just want to make sure this is my understanding. They were not using the same analyses in looking at the wetlands. So it's not like the commission was failing to refute the other side. They were not looking at it in the same way, and they were not characterizing it in the same way, but they were characterizing it in a way that there was no doubt that medication would be taken care of. That's why I kept asking, what is it we're missing? Am I hearing you correctly? You are correct, yes. We did not, I can't be clear enough, we did not rely upon the Pennsylvania methodology, except the exceptional classification. We relied upon the Corps of Engineers methodology, which classifies wetlands as forested or scrub-shrub or emergent, and those are all laid out in Table 2.2.4-1, where the commission lists the impacted acreage, the acreage that's impacted by construction, which is greater than the acreage impacted by operation. On the point of, you know, one of the purposes here to develop mitigation, one, we are going back a bit to some arguments that they raised before the commission that didn't really appear in their opening brief before this court. That said, the important point from the NEPA perspective is that there's nothing in NEPA that requires mitigation plans to be finalized at the point of the EA or at the point of the certificate order. I don't think we addressed that issue directly in our brief, since it hadn't been raised in our opening, but you can find those points in Robertson v. Methow Valley Citizens Council and also the Theodore Roosevelt Conservation Partnership Case 616F3, 497F517. So... Tell me exactly what points you think they're raising belatedly in the reply brief, because I had some concerns about that. What do you think is untimely? So before the commission, their arguments were pointed toward the development of mitigation, even on rehearing. And then in their opening brief, they certainly backed far off of that, if raised it at all, by focusing really only on the classification and not whether that resulted in some change to the impact. I think their argument focused in their opening brief was really to whether the commission's asserted misclassification of wetlands should result in a change to the finding of no significant impact. So they weren't focused on mitigation. So it's the mitigation issue in particular, and that's why I wanted to provide you with those citations, which I think should provide some assurance that the mitigation just does not need to be complete at this stage, regardless. What was his argument that the pipeline company came in later with indication that more wetlands would be covered than FERC had thought originally? And what's your answer to that? So the commission actually answered that, because that point was raised. And what the commission said is that if there are changes that need to be made to the classification, whether it's under the core standard or under the Pennsylvania standard, the core and Pennsylvania both will have and did have the opportunity to address that. We know that Riverkeeper challenged the water quality certification in the Third Circuit and did not prevail. The Third Circuit, I think, helpfully explains that the wetland classification under Pennsylvania standards becomes relevant actually not at the stage of the water quality certification, but at the Pennsylvania Section 105 permit stage, where, again, that becomes relevant. And that's where the mitigation is finally sorted out. And, again, that's okay under Robertson and the other D.C. Circuit cases that I've cited to you. I wondered if we should maybe talk about the issue of mootness that I believe you raised, Judge Barland. I want to be clear that our mootness argument only goes to the Clean Water Act issue, not to the NEPA issues. And that's because there's simply nothing that the court or the commission could do to get Pennsylvania to change its water quality certification. In other words, in their reply at 11, Riverkeeper says that Pennsylvania was hamstrung in its efforts to assess the project in the development of its water quality certification and subsequent permits. There's simply no record basis to lead to that conclusion. And we think that under Daimler Trucks, the case that Riverkeeper cites, it's important for the court to go through and see really just how speculative that would be. Here, what we have is a statement in particular from counsel for Pennsylvania Department of Environmental Protection before the Third Circuit. It's in the transcript appended to Intervenor Pipeline's brief at pages 24 and 25, transcript pages 24 and 25, where Pennsylvania says that they were aware that tree felling occurred before the issuance of the water quality certification and they had no objection to it. Those were their words. And so the idea that there could be some change in Pennsylvania's outcome is really more than speculative. Pennsylvania is, of course, not even before this court. The commission itself has no authority to require them to do something different. And so it's very difficult to see how there could be a change in that result there. Did the conditional certificate authorize the tree felling, or is that a consequence of the letter orders? That is absolutely a consequence of the letter orders, Your Honor. The conditional certificate really doesn't authorize anything. It's more of a vehicle for the later authorizations. Condition 9, as you pointed out in particular, requires the pipeline to come back and request subsequent authorizations. If the pipeline went and felled trees or engaged in other construction activities without coming back and receiving that approval from the commission, that would be a violation of the certificate, which really goes to the point that the letter orders needed to be challenged in order to reach any concern about tree felling because what Riverkeeper is really alleging is they're alleging a violation of the certificate. And the commission simply hasn't been presented with that claim. Further questions? Yeah, just one further question. What do you think about they keep coming back to the photos of the tree covered? Do you have a response to that? I do, and thank you for raising it, Your Honor. I would have forgotten. I want to point you to, in particular, JA-205 and JA-328, where we have the tables that we previously discussed. All that the commission is characterizing in Appendix I and in that table is the impacted acreage of the wetland. So when the commission says that a wetland is forested or is not forested, that characterization only goes to the impacted acreage. So, for instance, for wetland 007-002 that they cite in their reply brief at 21, the photo clearly shows that that's – what the photo shows is that the pipeline runs right along what I'm calling the top, since I'm not sure of the directionality of that wetland. And what the commission's table shows is that it characterized two-tenths of an acre that's impacted of that wetland as not forested. I think it was emergent or scrub shop. Scrub shop, I don't remember quite exactly now. But the point is we're only characterizing the impacted acreage, not the wetland in its entirety. You can see that simply from the headings on the tables at JA-205 and JA-328. Thank you. The intervener has three minutes. Yes, Your Honor. My name is John Stobiak. I'm here for the intervener. Transco, I want to go back to Judge Gorlin's question. What is the consequence of having a conditional certificate? Because I think that goes to one of the fundamental issues here. The conditional certificate order of public convenience and necessity determines whether there's a need for the project, determines the route for the project. What that then allows to happen with the condition that the applicant has to go get any federal permits, such as a 404 permit, which then triggers the need to get a 401 water quality certificate if there's going to be an activity that may result in a discharge to navigable waters, is that the state, Pennsylvania, the Pennsylvania Department of Environmental Protection, knows the route of the pipeline. It knows what to assess in terms of is there an impact that's untoward with respect to EPA-approved water quality standards, that is, this test under the 401 water quality certificate. If you don't know the route, what are you going to evaluate? You don't know what streams are going to be crossed. You don't know what wetlands are going to be crossed. So you need, as a first step in this process, the conditional certificate to occur. The second piece of why that's important is it authorizes an applicant to go exercise powers of eminent domain. We can talk to landowners and get access to their property by agreement, but some landowners refuse to give us access. Once we have the certificate of public convenience and necessity, we can go to court and get access and possession to do the site-specific information that was needed here. And that's the way the process works, and that's part of the audit. With the conditional certificate? Yes. That's what it specifically allows for. You can get the land, but you can't do anything on the land. Well, we can do what we're authorized to do. If we get a subsequent letter to fill treaties. Without a subsequent letter, you can't do anything. Without a subsequent letter, we cannot do anything. And, in fact, this conditional certificate is consistent, as Judge Rogers outlined, the process and the concurring opinion in Gunpowder Riverkeeper. This did not authorize construction. It required us to go get permits from the Army Corps, a 404 permit and a water quality certificate, if we were going to do activities that may result in a discharge to navigable waters. So that's point number one. The second point I want to make is this party here, the petitioner, had a full opportunity to challenge the issuance of the state water quality certificate, which they did in the Third Circuit. They had a full appeal, fully litigated. The Third Circuit said there is no reason to disturb the issuance of that state water quality certificate here. So that issue has already been vetted and decided by the Third Circuit Court of Appeals, which was issued its final mandate or certified judgment in lieu of mandate on Friday and changed some of the wording to tree felling from tree clearing. Your Honor, let me just ask whether any of the members of the panel have further questions. You don't doubt that at each successive step after a conditional approval, a final action is taken that could be subject to review? Yes, I don't. Thank you. Thank you, Your Honor. All right, I know there's no time. We'll give you another minute. I think one important issue that's been brought up here is the policy ramifications of having a 401 come after a FERC certificate. I think there's four things really to consider real quickly. If you have a 401 being issued after a FERC certificate, you're necessarily preventing, as I said earlier, the public from meaningfully participating and having full information before them. But I think it also begs the question, what happens where FERC issues a certificate, allows tree felling to take place, and then a state later blocks the project from moving forward, like we did in the Constitution Pipeline case, where you have thousands, hundreds, maybe thousands of acres of trees being cut down for a project that will never move forward? And that is an inevitability if we allow this permitting structure to continue with regard to the sequencing of the 401 and the FERC certificate. And neither Intervenor nor Transco has any answer to how to prevent that from happening in the future as it happened in the Constitution. Yeah, you could have challenged the tree felling orders. So here's the problem with that, is I was explaining to you earlier what the process is for challenging an order. You need to request rehearing. Then there's 30 days. And then FERC can sit on that for as long as they want. And in this case, it was a year and a half. Another case that we recently brought up was— You didn't challenge the orders. Correct, but it's futile. What I'm saying is that sort of challenge to prevent tree felling is futile. And there's no way—there really is no way to prevent that. And additionally, you have situations where, as Mr. Soviec alluded to, where people are brought into court for eminent domain proceedings. And it's highly stressful. Lots of resources, judicial resources, are used in making that eminent domain determination for a project that may be blocked later by a state by not issuing its 401. And again, that's what happened in Constitution. And again, they have no answer to describe how to prevent that from happening in the future. I would also like to say that the 401 itself is also a conditional approval. So Mr. Soviec's statement that, well, we need to know the root before we do the examination of the 401, I don't think has any merit, because what you can do there is the 401, you can go back with—if there's a root change as per the FERC certificate, you can go back and have the state redo the analysis based on the new citing of the pipeline, which is highly unusual in many ways. Are there further questions from the panel? No. Thank you. We'll take the matter under submission.
judges: Garland, Griffith, Edwards